1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7   DANIEL JONES,                          Case No.  13-cv-05626-JD

              Petitioner,

8
                                           ORDER DENYING PETITION FOR
9        v.                                WRIT OF HABEAS CORPUS AND
                                           DENYING CERTIFICATE OF
10  T. V. VIRGA,                           APPEALABILITY

              Respondent.

11

12

13          Daniel Jones, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. §

14  2254.  The Court ordered respondent to show cause why the writ should not be granted.

15  Respondent filed an answer and a memorandum of points and authorities in support of it, and

16  lodged exhibits with the Court.  Petitioner filed a traverse.  The petition is denied.

17                                    **BACKGROUND**

18          Jones was found guilty after a jury trial of second degree murder with an enhancement for

19  personal use of a deadly weapon.  Clerk's Transcript ("CT") at 3028.  It was also found that Jones

20  had suffered four prior strike convictions.  *People v. Jones*, No. A126023, A126883, 2012 WL

21  1028438, at *4 (Cal. Ct. App. March 27, 2012).  He was sentenced to forty-eight years to life in

22  prison.  *Id.*; CT at 3127, 3132.  The California Court of Appeal affirmed the conviction.  *Jones*,

23  2012 WL 1028438, at *1.  The California Supreme Court denied Jones' petition for review.

24  Answer, Ex. I.  Codefendant Michael Madison was charged with murder and tried with Jones.

25  Madison was found not guilty of murder.  Reporter's Transcript ("RT") at 4794; CT at 3029.

26          The California Court of Appeal summarized the facts of the crime as follows:

27              At trial, the evidence showed that, on April 25, 2005, the victim,
                Keith Wolf, was stabbed to death at an apartment complex in
28              Antioch.  He was 21 years old.  His body was found just after 10:30

p.m., lying face down and bloodied on the grass of an interior courtyard at the Runaway Bay Apartments. Wolf had stab wounds to his face, chest, back, and thigh. A wound that penetrated his heart was the cause of death. There were no contusions or bruises on his wrists or upper arms as would be expected if someone held or restrained him during the attack.

At about 10:30 p.m. that evening, Gloria Barton, who lived at the apartment complex, was on her balcony smoking a cigarette. Her balcony looked out toward San Jose Drive and Highway 4. Barton saw a red car that looked like a Camaro or a Trans Am Firebird pull up on San Jose Drive. After a minute or two, four men and a woman got out of the car. At first, the four men stood together in a group. Then one of them began running, heading west before changing direction and darting back toward the apartment complex entrance. The other three men ran after him. The woman remained by the car. Barton saw what she thought were the same four men return to the car after "only a minute or two." The men got into the car and the car drove off.

Shortly thereafter, two people walking through the apartment complex found Wolf's body. "[H]e had been stabbed, and he had blood on him...."

Inside the apartment complex, investigators found a bloody patch of ivy in an open area that looked "trampled and flattened," as if there had been considerable activity on that spot. The prosecution's blood pattern expert opined that the attack on Wolf had taken place there. A trail of blood led away from the ivy patch and further into the complex. It led to two apartment doorways, back into the courtyard, and ended where Wolf fell and died. DNA analysis of blood droplets at multiple points along the trail matched Wolf's DNA.

A separate trail of blood droplets led from the bloody patch of ivy, out of the apartment complex, and to the roadway of San Jose Drive, where it ended. DNA testing of multiple blood droplets in the roadway and curb of San Jose Drive where the trail ended showed a match to appellant.

The night Wolf died, appellant called Steve Buchanan. They had been cellmates at San Quentin in 2001. Appellant told Buchanan that "he had been in a knife fight, and he needed some place to come hang out." When appellant arrived at the hotel where Buchanan was staying, he looked "shaken up." He had blood on his clothes and a towel wrapped around his injured hand, which had been sewn up with fishing line. Appellant told Buchanan that he, Danielle Wells, and Madison had picked up Wolf at a BART station. Appellant said he became "enraged" sitting next to Wolf in the backseat of the car. Wells owned a red Pontiac Firebird. Appellant's DNA was later found on the bumper of that car.

Appellant also told Buchanan that Wolf was a "rat" who had just been released from protective custody at San Quentin. Inmates such as "child molesters, rapists, [and] rats" were housed in protective custody at San Quentin because their lives were in danger. A prison official confirmed that Wolf had been housed in protective custody

until his release on parole the day he was killed.

Buchanan testified that appellant said he planned to rob Wolf of his "gate money." FN4  The knife fight happened when they dropped Wolf off on San Jose Drive.  Wolf started running, and appellant chased after him, stabbed him, and then "blacked out."  Appellant showed Buchanan a bloody knife and said it was the one used to stab Wolf.

> FN4. "Gate money" is provided by California state prisons to inmates upon their release, as required by law.

Either the night of the murder or the next day, April 26, 2005, Buchanan called Nancy Skinner and asked her to bring a first aid kit to a motel room in Antioch because "his dawg got in a knife fight." Skinner said that, when she arrived on the morning of April 26, appellant was in the motel room and was bleeding from "a really bad cut on the back of his hand."  His clothes and shoes were bloody; his shirt was covered in blood.  Appellant told her that he cut his hand during a knife fight with a "rat" in the back seat of a car.  Appellant bled during the fight and was worried that his DNA was in the car.  As Buchanan and appellant left the motel room, Buchanan told him to "make sure that he had the knife."

Skinner met Buchanan and appellant again the next day at a house in Antioch.  Appellant had cleaned up and had a white gauze bandage on his hand.  The three of them and a man named Rick Torres discussed a newspaper article reporting that the other participant in the knife fight had died.  They also discussed Buchanan's idea that appellant should break a window and put glass in his pocket in case he was arrested, to create an innocent explanation for the cut on his hand.  While at the house, appellant received repeated cell phone calls from Danielle Wells.

Skinner and Buchanan eventually left the house and went to a park, where Buchanan threw appellant's shoes into a trash can.  They later returned and retrieved the shoes, took them to a house in Antioch, and burned them in the back yard along with a bag of bloody clothing appellant had brought with him.  Appellant told Buchanan he needed to steal a Firebird for its seats because his blood was on the seats in Wells' car.  Later, Skinner used her credit card to rent a motel room for appellant and Buchanan in Antioch.

On May 5, 2005, Antioch police officers were watching appellant outside a house in Antioch.  Appellant had a gauze bandage wrapped around his left hand.  Officers saw him drive off in a pick-up truck.  A marked patrol car started after appellant.  Appellant suddenly put the truck in reverse, drove backwards over a curb, and crashed into a parked car.  While the truck was still in motion, appellant jumped out and fled on foot.  With several police officers in pursuit, appellant ran to a nearby house and began to climb over a backyard fence.  An officer and a police dog caught appellant and dragged him down off the fence as he resisted.  Officer Matthew Harger testified that the dog did not bite appellant's hand.

3

Later that day, a police photographer arrived at the hospital to photograph appellant's hands.  Appellant became aggressive and angry, and tried to hide his hands.  Several officers had to restrain him as he thrashed around on the gurney.  He had fresh injuries on his right hand and legs.  The left hand had a wound that appeared to have been stitched and was starting to heal.

Stephanie Smith was pregnant with Wolf's child when he was killed.  After Wolf's death, she began dating appellant.  During their relationship, appellant told Smith he killed Wolf because of "disrespect" Wolf showed him.  Appellant recounted going with Wells to the BART station to pick up Wolf, sitting next to him in the back seat of the car, and driving to the Runaway Bay Apartments.  Appellant said he was holding a knife when they all got out of the car.

In August 2007, defendant Madison was apprehended on an outstanding warrant by law enforcement in Jeffersonville, Indiana.  He was with Stephanie Smith, who described the two of them as being "on the run."  Smith told a U.S. marshal that one of the reasons Wolf was killed was that "he was a rat."

Danielle Wells and Madison were dating at the time Wolf was killed.  By the time of the trial, she had given birth to Madison's daughter.  Wells had also dated Steve Buchanan.  In January 2008, and following Nancy Skinner's testimony at the preliminary hearing in this matter, Wells attacked Skinner while both were in custody in a Contra Costa jail facility.  Wells threatened to kill Skinner and Skinner's daughter.  In February 2008, while being transported on a jail bus, Wells spit on Skinner and called her a "rat bitch."  Wells also threatened Skinner and Smith during bus rides between the jail and the courthouse in February 2009, calling them "fucking rats."

Testifying under a grant of immunity, Wells stated that she picked up Wolf at the Pittsburg BART station in her red Firebird.  Appellant, Madison, and Jay Jay Sanborn were with her.  Wolf sat in the back seat between appellant and Sanborn.  Wells said they dropped Wolf off at the Runaway Bay Apartments; everyone got out of the car and "I think Danny [appellant] and Jay just walked him across the street."  Wells acknowledged that appellant got back in the car at some point and they drove off.  Instead of returning to her court-ordered residential drug program that night, she violated her probation by remaining away for the next week.  Shortly thereafter, she learned she was being sought by the police in connection with a murder investigation.  She left for Bakersfield, also in violation of her probation.  She was arrested in Bakersfield and brought back to Antioch.

*Jones*, 2012 WL 1028438, at *1-3 (footnotes omitted).

United States District Court<br>Northern District of California

4

United States District Court
Northern District of California

### STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

### DISCUSSION

As grounds for federal habeas relief, Jones asserts that: (1) the trial court improperly admitted evidence of his gang involvement; (2) unreliable hearsay testimony was admitted in violation of the Confrontation Clause and *Bruton v. United States*, 391 U.S. 123 (1968); (3) an autopsy report was improperly admitted into evidence; (4) he was denied the right to effective counsel; and (5) there was cumulative error.

## I. GANG INVOLVEMENT

Jones first argues that the trial court erred by admitting evidence of his gang involvement with the Contra Costa County gang known as the "CoCo Boys."

### Background

The California Court of Appeal described the relevant background for this claim:

> According to expert testimony at trial, the CoCo Boys, or "CoCo County," is "the dominant Caucasian gang" within the Contra Costa County jail system. The gang uses the slogan "snitches lie in ditches," meaning that those who cooperate with law enforcement are subject to violent retaliation, including being killed. According to Steve Buchanan, who had been a CoCo Boys member since 1995, people would want to kill him because of his cooperation in this case. A CoCo Boys member earns status for "getting a snitch." Buchanan said both appellant and Madison were members of the CoCo Boys.
>
> Wolf was housed in protective custody from March 2005 until he was paroled on April 25, 2005. About a month before he was paroled, Wolf reported being in fear of the CoCo Boys and requested protective custody housing at the county jail where he was then incarcerated. In CoCo Boys culture, being housed in protective custody carries significant negative stigma.
>
> Before trial, appellant filed a motion in limine to exclude "gang" evidence. The prosecution argued that, although the "CoCo Boys doesn't meet the definition of a street gang" for purposes of charging a gang offense or enhancement, appellant's affiliation with a group notorious for hostility and violence toward snitches was relevant to motive. The CoCo Boys were known to have an extreme dislike for snitches and to retaliate with violence toward anyone

perceived to be, or identified as, a snitch. The prosecutor also argued there was "ample and significant" evidence tying both defendants to the gang and evidence that they attacked the victim because of his status as a snitch. Thus, argued the prosecutor, evidence regarding the CoCo Boys and its beliefs and customs was relevant and probative of why Wolf was singled out and attacked. Ultimately, the trial court ruled that both defendants affiliation with the CoCo Boys and their belief that the decedent was a snitch were "certainly relevant and probative" with respect to motive, and that the probative value of this evidence outweighed the prejudicial effect.

The admissibility of evidence of appellant's gang affiliation and possible gang-related motive for Wolf's murder arose repeatedly at trial. The prosecutor provided a lengthy offer of proof concerning testimony from a law enforcement gang expert. The trial court ruled that general opinion testimony about appellant's involvement in the CoCo Boys was admissible, but excluded as unduly prejudicial some evidence of appellant's specific gang-related activities.

Agent Vincent Lawson, a parole agent in the gang unit of the Department of Corrections, testified regarding classifying and housing inmates in state prisons generally and at San Quentin in particular. Inmates who are labeled as snitches are placed in protective custody and segregated from the rest of the prison population for their own protection. Agent Lawson also testified regarding the hierarchy of prison gangs, their self-segregation by race, and the custom that each racial group would deal with a snitch in that group. Otherwise, inmates from another racial group would take care of the problem and the group that failed to act would be seen as weak.

Alfonso Tucker, deputy sheriff with the Contra Costa County Sheriff['s Department, testified as an expert regarding the structure and hierarchy of gangs. The CoCo Boys are the dominant white gang in the county and control the behavior and actions of all white male and female inmates. If they did not handle problems with members of their own race, other gangs would label them weak.

During Deputy Tucker's testimony, the trial court reiterated that gang evidence was admitted for the purpose of establishing motive. The court excluded expert opinion evidence that either appellant or Madison was given specific authorization by gang leadership to kill Wolf. Also excluded was the opinion that CoCo Boys snitches are potentially subject to retaliatory killing.

In addition to testimony by law enforcement and Buchanan, evidence pertaining to the CoCo Boys and other gang-related evidence admitted at trial over objection included pictures of Madison's gang tattoos and documents identifying him as a gang member in prison, a letter to appellant from known CoCo Boys gang member Matthew Jagger, a photograph including Jagger with CoCo Boys tattoos and drawings, and a photo of CoCo Boys gang members Shane and Bobby which states, "Danny, you've only been here a minute but it's enough for me to like your style. Good luck with everything and keep in touch. Love and respect, Bobby," with

7

1    CoCo Boys symbols and swastikas.

2    Based on a hypothetical about these documents and Buchanan's
     testimony, Tucker opined that appellant is a member of CoCo Boys.
3    Based on a different hypothetical, Tucker was also of the opinion
     that Madison was an active CoCo Boys member.

4    The trial court gave a limiting instruction regarding the purposes for
     which the jury could consider the gang evidence: "Evidence was
5    received as to the alleged membership of the defendants in a gang.
     You may consider such evidence to the extent you find it relevant
6    only as to issues of motive and intent.  You may not consider it as
     evidence of any defendant's character, nor as evidence of
7    predisposition to engage in criminal conduct."  In her closing
     argument, the prosecutor emphasized this point: "Motive is the only
8    thing that the CoCo Boy [s] evidence came in for...."

9    *Jones*, 2012 WL 1028438, at *4-5.

10       **Legal Standard**

11       The admission of evidence is not subject to federal habeas review unless a specific

12   constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

13   the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031

14   (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant

15   or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of

16   the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's

17   admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit

18   precedent but not contrary to, or an unreasonable application of, clearly established Federal law

19   under § 2254(d)).

20       Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis

21   for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031. The due

22   process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so

23   prejudicial that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357

24   (9th Cir. 1995).

25       **Discussion**

26       The California Court of Appeal analyzed this claim at length and found that under state

27   law the gang evidence was properly admitted to show motive and that the evidence's probative

28   value outweighed its prejudicial effect resulting in no error under state or federal standards.  *Jones*,

United States District Court
Northern District of California

8

2012 WL 1028438, at *5-9.  To the extent Jones argues that there was an error under state law, he is not entitled to relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law).

Nor has Jones demonstrated reddressable error in the holding denying a due process violation.  There is no Supreme Court authority that the admission of irrelevant or overtly prejudicial evidence will support habeas relief, and Jones has not met his heavy burden in showing that the admitted evidence rendered the trial fundamentally unfair.  Even if admitting the evidence was an error, the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993) in light of the limiting instruction from the trial court and the overwhelming evidence against Jones.  As noted by the California Court of Appeal:

> Finally, even if admission of some or all of the gang evidence was error, the evidence of appellant's guilt was strong without consideration of any gang-related aspects.  Multiple witnesses placed appellant in the car that picked up Wolf and drove him to the apartment complex; multiple witnesses recounted appellant's admission that he stabbed Wolf; DNA evidence established the fact that appellant was bleeding at the street where Wells had stopped the car; multiple witnesses described the wound to appellant's hand right after the murder; multiple witnesses described appellant in possession of the bloody knife and described appellant's bloody clothing shortly after the murder; multiple witnesses described discussions with appellant about concealing evidence of the stabbing and preparing a false explanation for his wounded hand; law enforcement witnesses described appellant's attempt to avoid capture in a vehicle and then on foot, and his attempt to conceal his wounded hand.  None of this evidence is gang-related, yet it provides ample proof that appellant killed Wolf.

*Jones*, 2012 WL 1028438, at *9.

## II.   CODEFENDANT STATEMENTS

Jones argues that the admission of his nontestifying codefendant's hearsay statements violated the Confrontation Clause and *Bruton v. United States*, 391 U.S. 123 (1968).

### Background

The California Court of Appeal described the relevant background for this claim:

> In a motion in limine, appellant objected in general to the admission of hearsay, citing the Sixth Amendment, *Bruton*, and *Aranda*. During trial, appellant prospectively objected on confrontation clause grounds to aspects of Stephanie Smith's and Steve Buchanan's testimony in which they would repeat statements by

codefendant Madison about events on the night of the murder.  The trial court granted the defense motion to exclude certain statements *Madison* made to Smith regarding appellant's conduct and statements that indicated appellant's presence in the car that picked up Wolf at the BART station.  Pursuant to that ruling, Smith's testimony about Madison's description of who was in Danielle Wells' car that night did not mention appellant, but instead referred to "others."

Appellant takes issue here with two other portions of Smith's testimony regarding statements by Madison that the trial court admitted.  First, Madison told Smith that immediately after the stabbing, appellant said, "I really fucked up now.  Just leave me here.  Just leave me here."  The court ruled that the statement attributed to appellant was admissible as "an excited utterance made contemporaneously with the event or immediately following it and under the influence of that excitement...."  Accordingly, the jury heard the following testimony from Stephanie Smith:

"Q: Did Mr. Madison tell you about anything that he saw?

"A: Yes.

"Q: What did he tell you?

"A: He said he saw others start to get on Keith like to beat him up first and that [Madison] saw [appellant] standing there saying, 'I really fucked up now. Just leave me here. Just leave me here.' "

Second, Madison told Smith that he saw appellant's injured hand after the attack on Wolf and helped appellant into Wells' car.  The trial court determined that these statements were admissible as declarations against penal interest because they demonstrated Madison's first-hand knowledge of the attack on Wolf and that Madison helped appellant to get away. The jury heard the following testimony from Smith:

"Q: Did Mr. Madison tell you how Mr. Jones appeared when Mr. Jones was saying, 'I really fucked up. Just leave me here?'

"A: Seemed like he wasn't even himself. Like he was – like he didn't even know what was going on.

"Q: Did he describe anything about Mr. Jones' physical appearance?

"A: Yes.

"Q: What did he see?

"A: That he had stabbed himself....

"Q: Did Mr. Madison tell you what he did when Danny Jones told Mr. Madison, "Just leave me here.  I really fucked up?"

"A: He said that he – he – 'Come on Danny.  Let's get out of here. Come on.'  Then helped Danny to the car....

"Q: Did Mr. Madison tell you whether or not he and Mr. Jones left the area together?

"A: Yes.

"Q: How did they leave the area?

"A: In Danielle's car."

Appellant renewed his objection to this evidence on several grounds, including hearsay and speculation.  The trial court admonished the jury that it could not "consider something that Mr. Jones purportedly said as against Mr. Madison" and that it could not "consider something that Mr. Madison purportedly said as against Mr. Jones. [¶]   That's because neither one of them can call the other as a witness to cross-examine them about those statements.  [¶]  So you have to consider them for a limit[ed] purpose only and only as to whether either of those statements again, assuming you believe the[y] were made and are accurately recounted to you only to the extent those statements reflect on the responsibility of that defendant."  In response to subsequent objections, the trial court repeated its limiting instruction.

Over objection, accompanied by the court's admonition, the jury also heard the following testimony from Smith:

"Q: Isn't it true that you previously told Investigator Lynn that Michael Madison told you that Daniel was bleeding, and that there was a reason he took Daniel away from there?

"A: Yes.

"Q: Because he didn't want to leave him there in that condition?

"A: Yes.

"Q: And he wanted to get him some place to render aid?

"A: Yes."

During Steve Buchanan's testimony, substantially similar statements by Madison about helping appellant flee the scene also drew objections by counsel on *Aranda/Bruton* grounds.   The court admitted these statements subject to the same admonition limiting the use of the testimony.  This testimony included the following:

"Q: Did you ask Mr. Madison if he was so pissed off at Danny then why did he tell Danny, "Come on. Let's go"?

"A: Yes, I did....

"Q: Did you ask Mr. Madison why he didn't leave Mr. Jones' ass there? ...

"A: Mike – when I talked to Mike, Mike was always mad a[t]

11

Danny because Danny put him in that position.  Danny took it upon himself to do what he did by himself.  And he was always pissed off talking shit about, he wants to take off on Danny.  [¶]  And I asked him, 'Well, if you were so mad at Danny, why didn't you just leave him there?'  And he told me that he was going to leave him there, but Danny had already come back to the car.

"Q: Did you ask Mr. Madison why he told Danny specifically, "Come on. Let's go"?

"A: Yes, I did.

"Q: What did Mr. Madison say?

"A: He said he wanted Danny to quit stabbing the dude."

The court repeated the admonition that the statement was only admissible against Madison.

Prior to closing arguments, the trial court instructed the jury as follows: "You've heard evidence that defendants Daniel Jones and Michael Madison each made statements before the trial.  Unless you were specifically directed otherwise at the time of the testimony, you may consider that evidence only against the defendant making the statement and not against the other defendant."

*Jones*, 2012 WL 1028438, at *10-11.

### Legal Standard

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"  U.S. Const. amend. VI.  In *Crawford v. Washington*, 541 U.S. 36, (2004), the Supreme Court held that the Confrontation Clause bars the admission of "testimonial" out-of-court statements by witnesses not appearing at trial unless either (1) the statements are offered for purposes other than proving the truth of the matter asserted or (2) the witnesses are unavailable and the defendant had a prior opportunity to cross-examine them.  *Id.* at 51-54, 59 & n. 9. Critically, however, only "testimonial statements" implicate the Confrontation Clause and *Crawford's* holding.  *Davis v. Washington*, 547 U.S. 813, 821 (2006); *see also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement").

In *Crawford*, the Supreme Court declined to define the meaning of "testimonial." 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of

12

'testimonial.'").  Subsequent Supreme Court cases suggest, however, that a statement is "testimonial" if its declarant knew, or should have known, that its primary utility was to provide evidence of the defendant's unlawful conduct for use in his prosecution or a criminal investigation into past events.  *See Williams v. Illinois*, 132 S. Ct. 2221, 2242 (2012) ("The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions."); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (opining that a statement is "testimonial" if it was made for an "evidentiary purpose" and "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (quoting *Crawford* at 52).

The Confrontation Clause has had a specific application to certain statements made by nontestifying codefendants.  Under what is commonly called the *Bruton* rule, the Confrontation Clause may be violated when statements made by a nontestifying codefendant are offered as evidence and such statements directly implicate another defendant who has not, or will not have, an opportunity to cross-examine the codefendant regarding the statements.  *Bruton*, 391 U.S. at 135-37.  The *Bruton* rule applies even if the jury is instructed to consider the nontestifying codefendant's statements only against him.  *Id.*

*Crawford* did not address the effect of the new rule announced on the *Bruton* rule.  However, since *Crawford* issued, numerous federal circuit courts have concluded that *Bruton* must be applied in the light of *Crawford*, and thus, the *Bruton* rule does not apply when the codefendant's statement is nontestimonial.  *See*, *e.g.*, *Smith v. Chavez*, 2014 WL 1229918, at *1 (9th Cir. March 4, 2014) (because the out-of-court statement by the nontestifying codefendant—an account of the crime given to his girlfriend in a motel—"was clearly not testimonial," it was reasonable for the state court to reject a *Bruton* claim, "given that *Bruton's* core holding relies on the Confrontation Clause" and *Crawford* teaches that the Confrontation Clause bars only testimonial out-of-court statements); *United States v. Vasquez*, 766 F.3d 373, 378-79 (5th Cir.

United States District Court
Northern District of California

2014) (observing that "[m]any circuit courts have held that *Bruton* applies only to statements by co-defendants that are testimonial under *Crawford*," including the First, Second, Third, Fourth, Sixth, Eighth, Ninth, and Tenth Circuits); *see also Coleman v. Lewis*, No. CV 13-3268-MAN, 2014 WL 3955329, at *11 (C.D. Cal. Aug. 13, 2014) (collecting circuit cases holding that *Bruton* does not apply to nontestimonial statements).

### Discussion

The California Court of Appeal described the relevant state and federal law and then denied this claim:

> Appellant contends that the admission of Madison's incriminating hearsay statements violated his Sixth Amendment right to confront witnesses. We disagree because Madison's statements were not testimonial under Crawford and thus appellant's confrontation rights were not implicated. (*See People v. Arceo*, *supra*, 195 Cal. App. 4th at pp. 571–575 ["the confrontation clause applies only to testimonial statements"]; *People v. Garcia*, *supra*, 168 Cal. App. 4th at p. 291 ["If the statement is not testimonial, it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule"]; *see also People v. Cage* (2007) 40 Cal. 4th 965, 984 ["the confrontation clause is concerned solely with hearsay statements that are testimonial"].)
>
> In *Crawford*, the Supreme Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'" (541 U.S. at p. 68.) It provided some guidance, however: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Ibid*.) The court explained: "[The confrontation clause] applies to 'witnesses' against the accused-in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Id.*, at p. 51.) Madison was not acting as a witness when he made the statements to Smith and Buchanan. His remarks were made during private, casual conversations; neither Smith nor Buchanan was a government officer, and Madison had no reason to think that his statements would be used as evidence in a criminal trial. Madison's statements were nontestimonial and appellant's confrontation rights were not implicated.

*Jones*, 2012 WL 1028438, at *12 (footnote omitted).

United States District Court
Northern District of California

1    Jones has not shown that the California Court of Appeal's opinion and interpretation of

2    Supreme Court authority was unreasonable.  It is undisputed that the statements at issue were not

3    made to law enforcement; rather, the codefendant made statements to private individuals who had

4    been to varying degrees involved in the incident.  The facts of this case are similar to *Smith v.*

5    *Chavez*, 2014 WL 1229918, at *1 (9th Cir. March 4, 2014) where the out-of-court statement by

6    the nontestifying codefendant consisted of an account of the crime given to his girlfriend in a

7    motel and the Ninth Circuit held that the statement was not testimonial and that it was reasonable

8    for the state court to reject the *Bruton* claim.  Jones has failed to show that the statements in this

9    case were "testimonial" with respect to *Crawford* and *Bruton*.

10    As the Ninth Circuit has observed, *Crawford's* discussion of what may constitute a

11    testimonial statement was premised on the use of statements "made to a government officer with

12    an eye toward trial, the primary abuse at which the Confrontation Clause was directed."  *Jensen v.*

13    *Pliler*, 439 F.3d 1086, 1089 (9th Cir. 2006).  Supreme Court precedent still does not define

14    "testimonial" and "nontestimonial" statements with precision.  *See Flournoy v. Small*, 681 F.3d

15    1000, 1004, 1005 (9th Cir. 2012) (stating that *Crawford* and its progeny fail to "delineate precisely

16    what statements qualify as 'testimonial'").  In the absence of a clearly established Supreme Court

17    definition of "testimonial," this Court must give state courts leeway in their case-by-case

18    applications of *Crawford* and subsequent decisions.  *See Yarborough v. Alvarado*, 541 U.S. 652,

19    664 (2004) ("The more general the rule, the more leeway state courts have in reaching outcomes

20    in case-by-case determinations.").  The Supreme Court recently found in *Ohio v. Clark*, 135 S. Ct.

21    2173 (2015) that a child's statements to a teacher concerning abuse were not testimonial and,

22    generally statements made to individuals other than law enforcement will not be testimonial as the

23    test is whether the statements were made with the primary purpose of creating evidence for a

24    prosecution.  *Id.* at 2179-82.

25    Moreover, in *Bruton*, the government did not attempt to use the confession of Bruton's

26    codefendant as evidence against Bruton himself because under the prevailing rules of evidence,

27    the confession would have constituted inadmissible hearsay if it had been used against Bruton.

28    The Supreme Court noted this distinction and expressly reserved the question of whether the

15

Confrontation Clause is violated by the admission of one defendant's extrajudicial statements against his codefendant at their joint trial under an exception to the hearsay rule:

> We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence . . . . There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause.

*Bruton*, 391 U.S. at 128 n.3 (citations omitted); *see also United States v. Arceneaux*, 437 F.2d 924, 927 n.5 (9th Cir. 1971) ("*Bruton* expressly refrained from the expression of an opinion in cases where the hearsay rule is not violated."). In this case the state court found that the statements were admissible under exceptions to the hearsay rule.

Finally, even if it was an error to allow this evidence, any error was harmless in light of all the other evidence presented against Jones. The state court's denial of this claim was not an unreasonable application of Supreme Court authority and Jones is not entitled to habeas relief.

**III.    AUTOPSY REPORT**

Jones contends that the Confrontation Clause was violated when the autopsy report and autopsy diagrams were admitted from the pathologist who performed the autopsy but who did not testify at trial. Jones also argues that the testimony from a pathologist who did testify at trial violated his right to confrontation.

**Background**

The California Court of Appeal described the relevant background for this claim:

> The pathologist who performed the autopsy, Dr. Brian Peterson, moved to Wisconsin before trial. He did not testify. During pretrial motions the prosecution disclosed that it would call Dr. Gregory Reiber as its pathology expert. Dr. Reiber is a board-certified forensic pathologist employed by a private forensic pathology group, Forensic Medical Group, that contracted to provide medical services for the Contra Costa County Coroner's Office. Dr. Reiber had worked closely with Dr. Peterson at Forensic Medical Group, including succeeding him as president of the group, watching him perform autopsies, and reviewing his work. The court ruled that Dr. Reiber could testify as to the nature of the wounds on the body, "offensive or lack of defensive wounds," and the position of the body at the time of the wounds, but could not testify "as to any so-called crime scene reconstruction of the events."

The trial court received into evidence a copy of Dr. Peterson's autopsy report as both an official record and a business record, indicating that it could serve as evidence of "Dr. Peterson's determination as to cause of death" and as a basis for the trial witness's expert opinions.   Counsel for Madison objected several times on grounds of hearsay, foundation, "Sixth Amendment," and " Crawford;" the objections were overruled and a continuing objection on these grounds was lodged.

Dr. Reiber reviewed Dr. Peterson's autopsy report in this case and photographs taken during the autopsy.   Dr. Reiber opined that Dr. Peterson had observed standard procedures in conducting and documenting the autopsy, including the collection of reference samples.    Dr. Reiber also testified regarding photographs and information in the report, including his disagreement with Dr. Peterson's characterization of the direction of force of a particular injury.

A pathologist called by codefendant Madison testified that she noted injuries to Wolf's hands in photographs taken during the autopsy, but those injuries were not documented in Dr. Peterson's autopsy report.

*Jones*, 2012 WL 1028438, at *13.

### Legal Standard

In *Melendez-Diaz v. Massachusetts*, the Supreme Court held that the trial court erred by admitting notarized affidavits from analysts confirming that the substance recovered from the defendant was, in fact, cocaine, without requiring the analysts to testify in the proceedings.  557 U.S. 305, 308-10 (2009).  The Supreme Court explained that because the affidavits fell within the "core class of testimonial statements," the defendant was entitled to confront the analysts at trial, unless the prosecution could show not only that the analysts were unavailable, but also that the defendant had previously had the opportunity to cross-examine them.  *Id*. at 311.

Later, in *Bullcoming v. New Mexico*, the Supreme Court held that it was error to admit a forensic lab report from a non-testifying analyst establishing the defendant's blood-alcohol concentration through the testimony of a colleague who neither performed nor observed the testing process.  131 S. Ct. 2705, 2715-17 (2011).  The Supreme Court reasoned that the introduction of "a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification" violates the Confrontation Clause.  *Id*. at 2710.

1       However, in *Williams v. Illinois*, a four-justice plurality of the Supreme Court stated that

2  admitting an opinion from a DNA expert based on a report from another laboratory did not violate

3  the Confrontation Clause.  132 S. Ct. 2221, 2243 (2012) (plurality op. of Alito, J.).  The plurality

4  opinion presented two alternative grounds for its conclusion: (1) the report was not offered for its

5  truth, but rather to explain the basis for the DNA expert's opinion; and (2) even if the report had

6  been offered for its truth, the report was not a testimonial statement because it was "not prepared

7  for the primary purpose of accusing a targeted individual."  *Id.*

8       Confrontation Clause claims are subject to harmless error analysis.  *United States v.*

9  *Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case); *see also United States v. Allen*,

10  425 F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard

11  applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an

12  actual and prejudicial effect upon the jury.  *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir.

13  2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

14     **Discussion**

15       The California Court of Appeal noted that the law was unsettled regarding whether the

16  autopsy records and Dr. Reiber's testimony were properly admitted into evidence.  *Jones*, 2012

17  WL 1028438, at *15.  The state court also noted that a case with similar facts was pending at that

18  time in the California Supreme Court.  *People v. Dungo*, 55 Cal. 4th 608 (2012).  Currently, the

19  law remains unsettled without clear Supreme Court authority deciding if autopsy reports are

20  testimonial.  *See Nardi v. Pepe*, 662 F.3d 107, 112 (1st Cir. 2011) ("even now [after *Melendez-*

21  *Diaz* and *Bullcoming*] it is uncertain whether, under its primary purpose test, the Supreme Court

22  would classify autopsy reports as testimonial.").   A split in deciding this issue has also arisen.

23  *Compare United States v. James*, 712 F.3d 79, 97-99 (2d Cir. 2013) (autopsy reports are not

24  testimonial); *People v. Dungo*, 55 Cal. 4th 608, 619-21 (2012) (statements in California autopsy

25  reports are not testimonial), *with United States v. Ignasiak*, 667 F.3d 1217, 1230-32 (11th Cir.

26  2012) (autopsy reports produced by members of the Florida Medical Examiners Commission are

27  testimonial).

28

United States District Court
Northern District of California

18

The California Court of Appeal expressed doubt that the evidence was properly admitted in light of *Crawford* and its progeny, yet the court did not look to the merits of the admission of the autopsy reports and Dr. Reiber's testimony; instead, the court found that if there was an error it was harmless:

> Appellant contends he was prejudiced by Dr. Reiber's testimony that the autopsy report did not indicate any defensive wounds. As a result, he argues, he could not present a self-defense theory. He contends that this testimony, plus testimony about the twisting nature of the knife, also impacted appellant's manslaughter defense based on provocation. Appellant further complains that, before trial, the prosecution and defense had agreed to stipulate as to the cause of death and present no testimony regarding the autopsy. Instead, on short notice, the defense had to challenge Dr. Reiber's testimony, Dr. Peterson's qualifications, and both his reputation and that of Forensic Medical Group.

> We reject this argument for several reasons. First, the autopsy report was admitted as hearsay evidence expressly "limited as to ... Dr. Peterson's determination as to cause of death." There was no dispute at trial that the cause of death was a stab wound to the heart. Second, the presence of defensive wounds on Wolf's body would do nothing to indicate that Wolf was an aggressor in the conflict. The jury heard that appellant suffered wounds to his hands, but since that evidence did not support giving self-defense instructions, the defensive wounds to Wolf certainly would not. Third, if Dr. Peterson failed to describe or photograph defensive wounds at the time of the autopsy, nearly four years before trial, there is no reason to think that he would have recalled such wounds had he been called as a witness. A defense expert contacted Dr. Peterson during her review of the case, asked him about injuries to Wolf's hands that had been photographed but not documented in the report, and Dr. Peterson's response indicated no independent recall of those injuries. In addition, Dr. Reiber testified that he independently reviewed photographs of the victim's hands and saw nothing he would characterize as a defensive injury. Finally, the autopsy photographs were available to, and utilized by, the defense. The defense expert testified that the photos revealed abrasions and injuries to Wolf's hands and knuckles, as well as other stabbing patterns, which the expert interpreted as defensive wounds.

> Furthermore, as discussed ante, section III.A., the evidence of appellant's guilt was strong. Any error in admitting the autopsy report or Dr. Reiber's testimony was harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Davis* (2009) 46 Cal. 4th 539, 620 [applying Chapman to a Crawford claim].)

*Jones*, 2012 WL 1028438, at *15.

1      If a state court finds an error harmless, that determination is reviewed under the deferential

2   AEDPA standard.  This means that relief is not available for the error unless the state court's

3   "harmlessness determination itself was unreasonable."  *Davis v. Ayala*, 135 S. Ct. 2187, 2199

4   (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).  In other words, a federal court may

5   grant relief only if the state court's harmlessness determination "was so lacking in justification

6   that there was an error well understood and comprehended in existing law beyond any possibility

7   for fairminded agreement."  *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  And if

8   the federal court determines that the state court's harmless error analysis was objectively

9   unreasonable, it also must find that the error was prejudicial under *Brecht* before it can grant relief.

10  *See Fry*, 551 U.S. at 119-20 (§ 2254(d)(1) did not displace *Brecht*).

11      Jones has failed to demonstrate that the state court's harmless error holding was

12  objectively unreasonable.  Nor has he shown that the error was prejudicial under *Brecht*.  The

13  autopsy report and expert testimony indicated that the victim died as a result of stab wounds and

14  the autopsy evidence was only admitted to describe the cause of death.  RT at 891.  The cause of

15  the victim's death was not in dispute at trial.  An expert pathologist called by codefendant

16  Madison testified that the victim died as a result of a stabbing wound to the chest.  RT at 3628.  A

17  detective who witnessed the autopsy also testified to seeing a hole in the victim's chest and heart

18  caused by a puncture wound.  RT at 760-63.  There was no prejudice in admitting the autopsy

19  report because the cause of death was not in dispute and the cause of death was introduced by

20  other witnesses.

21      Jones' argument that he was prejudiced by the autopsy evidence because it prevented him

22  from presenting a self-defense theory is also unavailing.  Jones maintains that the autopsy failed to

23  indicate defensive wounds on the victim thus it was necessary for the pathologist who performed

24  the autopsy to testify so that he could be cross-examined.  However, photographs of the autopsy

25  were available to Jones, and a defense expert for codefendant Madison testified that there were

26  abrasions and injuries to the victim's hands which he argued were defensive wounds.  RT at 3631-

27  36.  Any error admitting the evidence was harmless because the jury heard arguments and was

28  presented with evidence of that the victim had defensive wounds.  Finally, as noted in the first

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1  claim, there was a great deal of evidence presented against Jones, including several witnesses

2  placing him in the car with the victim that drove to the apartment; Jones' DNA evidence which

3  established that he was bleeding near the crime scene; the injuries to his hands; his bloody

4  clothing; and the witness testimony that Jones admitted to stabbing the victim.  Jones has not

5  shown that the state court opinion was so lacking in justification and that there was a well

6  understood error that would entitle him to habeas relief.  This claim is denied.[1]

7  **IV.      RIGHT TO COUNSEL**

8           Jones contends that he was denied the effective assistance of counsel and that the trial

9  court erred in denying his requests for a new attorney.

10          **Background**

11          Jones brought several motions to have his appointed attorney, Denise Nolan, discharged

12  and for new counsel to be appointed pursuant to *People v. Marsden*, 2 Cal. 3d 118 (1970).  On five

13  occasions *Marsden* hearings were held to inquire into Jones' request for new counsel, and the trial

14  court denied all the motions.  The California Court of Appeal set forth the extensive background

15  regarding the *Marsden* hearings and the conflicts between Jones and his attorney:

16              On November 9, 2007, after the preliminary hearing but prior to
                trial, the trial court (the Honorable Teresa J. Canepa) held a
17              *Marsden* hearing.  Appellant cited examples of dissatisfaction with
                his attorney's responsiveness to requests for information, timeliness
18              in providing him with case discovery, honesty, communication, and
                case preparation.  He asserted that counsel failed to respond to
19              requests for information from him and his family; that on more than
                one occasion she had promised to come and visit him but did not
20              show up; that she had refused to confer with him on preparation of
                the defense; and that he had refused to see or talk with her at times
21              and now refused to work with her due to the irreparable breach in
                their relationship and lack of trust.  He said counsel had failed to
22              investigate the case; witnesses were never contacted; counsel failed
                to object to the prosecutor's motions for continuances and
23              consolidation; and counsel did not file motions before the
                preliminary hearing for discovery and to get a confidential
24              informant.  Appellant stated that when he was charged in a separate
                case, no one from the public defender's office showed up for the
25              arraignment, and then later a different attorney showed up.
                Appellant stated that counsel lied to him, he had no faith in her and
26              did not trust her.

27  ─────────────────────────

28  [1] The Court need not analyze if the admission of the autopsy report and testimony violated the
    Confrontation Clause because even if the admission was an error, the error was harmless.

Appellant's counsel, Denise Nolan, then described her efforts to make prosecution discovery available and to maintain contact with appellant and his family. She stated that some of the discovery was provided during the course of the preliminary hearing and that appellant had seen most but not all of it. She said she had spoken to family members at the preliminary hearing and an uncle on one occasion. Nolan indicated that a *Marsden* hearing had been held in appellant's other case; the motion was denied. In response to a question from the court, she stated that she had been a criminal defense attorney for 27 years and had previously represented defendants accused of murder.

The court concluded that appellant had not demonstrated grounds for relief, finding "a lack of communication" on appellant's part and that it appeared that counsel was "performing everything that she is required to do." The court noted that counsel provided prosecution discovery to appellant, had been in touch with appellant's family, and that she was working to keep the case on track. The court found that she was "performing diligently and effectively" in preparing for trial, following a three-week preliminary hearing and an unusually large volume of documents.

On December 12, 2007, Judge Canepa held another *Marsden* hearing. Appellant stated that it was his fourth attempt to fire his attorney due to a "conflict of interest." He said Nolan had no interest in investigating his case and defending him properly. He had not seen her since the preliminary hearing; she had lied to him about coming to see him; and he was going to refuse to work with her. Appellant was concerned that she had spoken to one of her colleagues about his case and why appellant was refusing to talk to her, which appellant felt was a breach of the attorney-client relationship.

The court advised appellant that refusing to cooperate with counsel was not a basis for granting a *Marsden* motion.

Nolan said she was hopeful that she and appellant could get back on track. She and appellant had been able to work together during the preliminary hearing. She confirmed that the attorney who appeared with appellant in his other case and had spoken with him was a colleague in the alternate defender's office. Nolan was concerned that appellant thought she had lied, but they had not been able to talk about it. She indicated that there was a lot of work to be done in preparation for trial, and she was doing it. Although it would be helpful if appellant were participating, it could be done otherwise with her investigator.

The court denied the motion, finding that appellant had not sustained the burden of establishing either a lack of competence or inadequate representation.

A year later, on December 31, 2008, the court (the Honorable John C. Minney) held another Marsden hearing. Appellant stated that he was "under duress" and that Nolan's representation was "detrimental to having a fair and impartial trial." He was concerned

that originally, due to a conflict with the public defender's office, his case had been transferred to the alternate public defender's office and assigned to Nolan.  Several months ago, Nolan had transferred to the public defender's office along with his case, but the conflict had not been addressed.  He also expressed concern that she had told him several times that she would visit and go over discovery he had not seen, but the visits had not occurred.  His family had tried to contact her, but she never returned phone calls.  Appellant also stated that some of his witnesses were refusing to cooperate with her.

Nolan addressed the discovery in the case; she described voluminous documents, including approximately 3,200 pages of discovery thus far, plus 1500–1600 pages of transcripts from the preliminary hearing.  Witnesses and more discovery had been identified after the preliminary hearing.  Trial preparation included referencing and cross-referencing almost 5,000 pages of documents.  She had written a letter to appellant, explaining the investigation and trial preparation.  She went to visit him to go over a CD containing evidence, but appellant refused to see her so she left the CD for him to review.  She indicated that she and appellant had reviewed DVD's of new witnesses.  She said she realized appellant was frustrated and that it was a very serious case.  She said she was ready to go to trial, had reviewed and organized the 5,000 pages, and had talked regularly with counsel for the codefendant.  There was still some ongoing investigation, but she was confident that it would be completed in time for trial.  Counsel stated that she would like to meet with appellant as soon as possible to review DVD's and transcripts, and to discuss information and witnesses in the case.

Appellant disputed counsel's statement that she had gone over the new discovery with him.  He had seen some, but not all, of the old and new discovery (described as videos and DVD's).  He got the CD counsel left for him, but he was unable to play it.  He was supposed to be starting trial in less than two weeks, but had not seen his attorney since late October.  They had not discussed his defense or witnesses; the investigator had not talked to people appellant suggested.  Appellant stated that as long as Nolan was on his case, he would refuse to cooperate with her, as would "a lot" of his witnesses and family members.

The court denied the motion, finding that appellant had failed to show improper or inadequate representation.  The court also urged appellant to "set aside this closed door attitude" and work with counsel in preparing for trial.

On March 23, 2009, during trial, the court (the Honorable Terence L. Bruiniers) held a *Marsden* hearing.  Appellant stated that he and Nolan had never gotten along.  He explained that he had brain surgery in 1997 and was having trouble understanding what was happening at trial.  Before trial, no investigative work was done.  Appellant gave Nolan names, but she did not contact them.  She also had not discussed trial strategy with him.

The court observed that Nolan had been cross-examining the prosecution's witnesses and was "more than familiar" with the facts

of the case.  The court had also been signing removal orders for witnesses that Nolan intended to call on appellant's behalf.  The court questioned appellant closely about what he did not understand and then stated on the record: "I don't see anything so far to indicate a basis to declare a doubt as to your competence."

Nolan confirmed that there had been prior *Marsden* motions and agreed that appellant did not want to work with her and that there had been difficulties at times in their communication.  She stated that she had gone over various aspects of trial preparation with appellant, including the defense witnesses, witness preparation, evidence, and trial strategy.  She expressed concern that, although they had gone over these matters, appellant had stated several times that he did not understand what was happening.

Appellant interjected that counsel was lying.  He said he and Nolan had not gone over trial preparation or witnesses.  He had not seen all the witness interviews, and they had only talked about a few witnesses counsel intended to call.  She had not pursued contacting several witnesses appellant identified after having trouble tracking them down.

Nolan responded that she and appellant had a challenging relationship in that appellant chose not to speak with her at times, and some of the letters she sent him were returned.  She was concerned that appellant was so dissatisfied that he would not provide information.  She stated that investigation was being done in the case; an investigator had contacted numerous witnesses and was on the witness list.  She repeated her concern that appellant did not understand what was happening and did not seem to remember things they had discussed.

Appellant responded that everything counsel was saying was a lie.  Appellant thought she was going to call a lot more witnesses in his defense.  He stated that "a lot of people are refusing to cooperate with her because of my concerns that I don't trust her."  He asked the court to relieve Nolan as counsel.

The court denied the motion, stating: "I see no evidence that Ms. Nolan has failed to provide competent and qualified representation here. [¶] I see no indication that [appellant] is not capable of understanding the proceedings or capable of cooperating with counsel should he choose to do so. [¶] I understand there may be some strains in the attorney/client relationship.  That does not provide a basis for me to relieve counsel at this point, Mr. Jones.  Certainly not in the middle of trial."  In addition, the court explained that decisions such as which witnesses to call and strategy in presenting the defense were professional decisions the lawyer has to make on the client's behalf "whether you agree with all of them or not."  The court also advised appellant that it was in his interest to cooperate with counsel.

Appellant stated that he had tried to cooperate, but repeated his complaint that counsel had not contacted his witnesses.  The court acknowledged the difference in representations it had received on

24

that issue and indicated that it accepted what Nolan said regarding what she had done in the case. The court stated it was confident that Nolan had investigated the case, was continuing to do so, and that she was working hard on his behalf. The court repeated that it was in appellant's interest to cooperate with his attorney. Appellant replied, "I'm going to continue to refuse."

Two days later, on March 25, 2009, Judge Bruiniers held another *Marsden* hearing. Appellant stated that he tried to talk to counsel the previous day but after five minutes she got up and left. She said she would have 20 minutes to talk with him the previous Sunday, but in the middle of the discussion she left. He gave her questions to ask various witnesses at trial and at the preliminary hearing, but she did not ask them. She had not talked with him about the preparation of the defense before trial. She continued to lie to him; he had no faith and did not trust her. She failed to investigate his case and no investigator was assigned. She failed to file motions and failed to object to motions filed by the defense. She failed to communicate with appellant; failed to go over discovery with him; his family and witnesses said they would not work with her; and appellant refused to share any information with her. Appellant complained that Nolan spoke with some, but not all, of the witnesses, and she refused to call as witnesses certain individuals he identified.

Counsel explained that she met with appellant the previous day, but there was a breakdown in communication. Appellant only wanted to talk about things they had already gone over, and he did not seem to understand her responses. The investigator had followed up on information provided in the last week, but most of the information had not led anywhere because of inability to locate some people and other people's unwillingness to speak with the investigator. She confirmed having met with appellant the previous Sunday. She explained to him that her time was limited because she needed to get back to the office to prepare for trial. She spent close to an hour meeting with appellant, but they spent the time going over things they had gone over before and appellant was frustrated and dissatisfied with what had happened with certain witnesses. Nolan also stated that sometimes appellant's family would speak with her and sometimes they would not. In discussions about the best way to proceed, counsel tried to explain to appellant that, based on trial strategy, some of the witnesses might not be helpful. Counsel acknowledged that appellant did not like working with her, that it was a difficult situation for him.

The court stated, "I haven't seen any indication at all that Ms. Nolan has been ineffective in her trial preparation or trial presentation. [¶] And while I understand for you this is stressful and perhaps confusing in some areas, this trial lawyer, Ms. Nolan, is one of the most experienced trial lawyers in her office." The court denied the motion, finding no legal basis for removing Nolan from the case.

*Jones*, 2012 WL 1028438, at *16-19 (footnote omitted).

United States District Court
Northern District of California

**Legal Standard**

A criminal defendant who cannot afford to retain counsel has no right to counsel of his own choosing.  *Wheat v. United States*, 486 U.S. 153, 159 (1988); *see also Morris v. Slappy*, 461 U.S. 1, 14 (1983) (no right to insist on delay in mid-trial until public defender recovers from emergency surgery where substitute counsel is adequately prepared).  Nor is he entitled to an attorney who likes and feels comfortable with him.  *United States v. Schaff*, 948 F.2d 501, 505 (9th Cir. 1991).  The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel.  *Morris*, 461 U.S. at 14.

The denial of an indigent criminal defendant's motion for substitution of counsel may nevertheless violate his Sixth Amendment right to counsel.  *See Daniels v. Woodford*, 428 F.3d 1181, 1197-98 (9th Cir. 2005) (noting that test for determining whether court should have granted substitution motion is same as test for determining whether an irreconcilable conflict existed); *see*, *e.g.*, *United States v. Moore*, 159 F.3d 1154, 1160 (9th Cir. 1998) (where irreconcilable conflict existed between defendant and counsel trial court's failure to appoint substitute counsel was reversible error).

The Ninth Circuit has held that when a defendant voices a potentially substantial complaint about counsel, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction.  *Bland v. Cal. Dep't of Corr.*, 20 F.3d 1469, 1475-76 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc).  The inquiry need only be as comprehensive as the circumstances reasonably would permit, however.  *King v. Rowland*, 977 F.2d 1354, 1357 (9th Cir. 1992) (record may demonstrate that extensive inquiry was not necessary).

**Discussion**

Jones argued on direct appeal that the trial court failed to properly address the breakdown of the attorney-client relationship and that the failure to appoint new counsel violated his constitutional rights.  He points to the allegations that counsel lied to him and failed to obtain discovery, file motions, contact witnesses, and adequately communicate with him.  The California Court of Appeal denied this claim:

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

We find no abuse of discretion by the trial court in denying the four *Marsden* motions.  The court conducted an appropriate in camera hearing on each of the motions.  At each hearing, the court fully inquired of appellant and Nolan about the issues giving rise to the requests to replace counsel.  Many of appellant's complaints related to disagreements about strategy and preparation for the preliminary hearing and trial.  However, "'"[t]actical disagreements between the defendant and his attorney do not ... constitute an 'irreconcilable conflict'"' unless they portend a complete breakdown in the attorney-client relationship.  (*People v. Jackson* (2009) 45 Cal. 4th 662, 688; *see People v. Freeman* (1994) 8 Cal. 4th 450, 481 [defendant's distrust of counsel who suggested he plead guilty did not state an adequate basis for substitution of counsel].)" (*Clark*, *supra*, 52 Cal. 4th at p. 912.)

Appellant's other complaints related to communication between Nolan on one hand, and appellant, his family, and certain of his witnesses on the other.  Each time, the court found that Nolan was providing competent representation and could and would continue to do so despite the strained relationship with appellant.  "A trial court is not required to conclude that an irreconcilable conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel...." (*People v. Crandell* (1988) 46 Cal. 3d 833, 860.)  In light of appellant's repeated attempts to replace Nolan, the trial court could reasonably find that any efforts to resolve his disagreements with her were insufficient.  Moreover, appellant's repeated statements that he would refuse to work with her, as would family members and witnesses, strongly suggest that any breakdown in his relationship with counsel was largely attributable to his own attitude and refusal to cooperate.  (*People v. Michaels* (2002) 28 Cal. 4th 486, 523 [defendant cannot compel substitution of counsel simply by refusing to cooperate].)

We also note that each successive request for substitution counsel was based largely on points raised in previous *Marsden* hearings.  The court was entitled to credit Nolan's assertions that she was keeping appellant informed regarding defense strategy, was not ignoring him, and wanted to communicate with him.  (*People v. Abilez* (2007) 41 Cal.4th 472, 488.)  After permitting appellant to fully express his complaints with counsel, inquiring into them, and evaluating them against counsel's explanations and, in the case at least of the two *Marsden* motions brought during trial, the court's own observations of appellant's in-court communication with his attorney, the court reasonably could find appellant's claimed inability to communicate with counsel was a conscious choice, and a contrived one.  A defendant cannot simply refuse to cooperate with appointed counsel and thereby compel the court to remove that attorney.  (*People v. Michaels*, *supra*, 28 Cal.4th at p. 523; *Smith*, supra, 30 Cal. 4th at p. 606.)

*Jones*, 2012 WL 1028438, at *19-20.

United States District Court
Northern District of California

1    The state court opinion finding there was no irreconcilable conflict between Jones and his

2    counsel and denying this claim, was not an unreasonable determination of the facts or Supreme

3    Court authority.  It is undisputed that the trial court held five *Marsden* hearings, including multiple

4    hearings during trial, to discuss the problems between Jones and his counsel.  The record reflects

5    that the trial court thoroughly inquired into Jones' claims during each *Marsden* hearing.  *See*

6    *Hudson v. Rushen*, 686 F.2d 826, 831 (9th Cir. 1982) (state court conducted adequate hearing

7    when it invited defendant to make a statement and listened to defendant's reasons for wanting new

8    counsel).

9    The California Court of Appeal reasonably rejected the argument that there was an

10    irreconcilable breakdown in the relationship between Jones and his attorney requiring new

11    counsel.  Counsel provided Jones with discovery, communicated with his family, adequately

12    investigated the case, and adequately prepared the defense.  To the extent that Jones disagrees with

13    the trial strategy, he is not entitled to relief.  Appointed counsel is entitled to make decisions about

14    trial strategy.  *See*, *e.g.*, *United States v. Corona-Garcia*, 210 F.3d 973, 977 n.2 (9th Cir. 2000)

15    ("Even if we were to conclude that the conflict with respect to trial tactics was severe, however,

16    we would still be disinclined to reverse on that ground because trial tactics are clearly within the

17    realm of powers committed to the discretion of defense counsel in any event."); *United States v.*

18    *Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987) ("[A]ppointed counsel, and not his client, is in

19    charge of the choice of trial tactics and the theory of defense.").  That Jones also on different

20    occasions refused to communicate with his appointed attorney does not demonstrate an

21    irreconcilable conflict.

22    Because Jones' claims about his trial counsel were either unsupported by evidence or

23    based on differences over trial strategy, the Court concludes that the nature of the conflict strongly

24    supports the trial court's denial of the multiple *Marsden* motions.  Jones has not shown that there

25    was an impediment that resulted in an attorney-client relationship that fell short of that required by

26    the Sixth Amendment.  The California Court of Appeal's rejection of this claim was neither

27

28

1    contrary to nor an unreasonable application of clearly established federal law.[2]

2    **V.      CUMULATIVE ERROR**

3         Jones also argues that the cumulative effect of the errors alleged above entitles him to

4    habeas relief.

5         **Legal Standard**

6         In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

7    the cumulative effect of several errors may still prejudice a defendant so much that his conviction

8    must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing

9    conviction where multiple constitutional errors hindered defendant's efforts to challenge every

10   important element of proof offered by prosecution).

11        Cumulative error is more likely to be found prejudicial when the government's case is

12   weak.  *See*, e.g., *Thomas v. Hubbard*, 273 F.3d 1164, 1179-80 (9th Cir. 2002), *overruled on other*

13   *grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (noting that the only

14   substantial evidence implicating the defendant was the uncorroborated testimony of a person who

15   had both a motive and an opportunity to commit the crime).  However, where there is no single

16   constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See*

17   *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  Similarly, there can be no cumulative error

18   when there has not been more than one error.  *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir.

19   2012).

20        **Discussion**

21        The California Court of Appeal denied this claim. noting that no prejudicial errors had

22   been found.  *Jones*, 2012 WL 1028438, at *20.  Similarly, this Court has not found any

23   constitutional errors, let alone multiple errors that cumulatively would allow for reversal.  *See*

24   *Hayes*, 632 F.3d at 524.  Moreover, there was a great deal of evidence implicating Jones.  The

25

26   _____

27   [2] To the extent Jones has exhausted and presents a claim of ineffective assistance of counsel, he
     has failed to show that counsel's performance was deficient and that he suffered prejudice
     pursuant to *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  He provides no specific details

28   on which witnesses his attorney should have contacted and what they would have testified to or
     what outstanding discovery would have aided his case.

United States District Court
Northern District of California

1   state court opinion denying this claim was not unreasonable, and Jones is not entitled to relief.

2   This claim is denied.

3   **VI.**          **CERTIFICATE OF APPEALABILITY**

4        The federal rules governing habeas cases brought by state prisoners require a district court

5   that issues an order denying a habeas petition to either grant or deny therein a certificate of

6   appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

7        A judge shall grant a certificate of appealability "only if the applicant has made a

8   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

9   certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3).  "Where a district

10  court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

11  is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

12  court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

13  473, 484 (2000).

14       Here, petitioner has made no showing warranting a certificate and so none is granted.

15  <div align="center">**CONCLUSION**</div>

16       For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate

17  of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

18       **IT IS SO ORDERED.**

19  Dated:  November 20, 2015

20

21  _____

22  JAMES DONATO
    United States District Judge

23

24

25

26

27

28

<div style="text-align:left; writing-mode: vertical;">United States District Court<br/>Northern District of California</div>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL JONES,

          Plaintiff,

    v.

T. V. VIRGA,

          Defendant.

Case No.  13-cv-05626-JD

**CERTIFICATE OF SERVICE**

      I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

      That on November 20, 2015, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Daniel  Jones ID: AA-4707
California State Prison- Sacramento
P. O. Box 290066
Represa, CA 95671

Dated: November 20, 2015

Susan Y. Soong
Clerk, United States District Court

By:_____
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO